STATE *vs.* ELMER L. EDWARDS *et al.*

JULY 10, 1959.

PRESENT: Condon, C. J., Roberts, Paolino and Frost, JJ.

380

PAOLINO, J. This is an indictment for conspiracy to violate the gambling laws. After a trial before a justice of the superior court sitting with a jury, two of the defendants were found guilty and their motion for a new trial was denied. The case is before us on their bill of exceptions to such denial and to numerous other rulings made before and during the trial.

The indictment charges that Elmer L. Edwards, Zigmund Micek and Vartan Hovanesian on October 16, 1953, and on divers other dates between August 1 and October 17, 1953, at Pawtucket in the county of Providence, "did unlawfully contrive, confederate and conspire together to

commit a criminal and unlawful act, to wit, to engage in bookmaking and to record and register, and did have recorded and registered, bets and wagers upon the results of contests of skill, speed and power of endurance of horses, for gain and reward in money from that bet or wagered on such result, in violation of Chapter 612, Section 35 of the General Laws of Rhode Island, 1938." The indictment was found by a grand jury attending the superior court sitting at Providence for the counties of Providence and Bristol. The grand jury included three jurors drawn from Bristol county. The remaining jurors were drawn from Providence county.

On the day of the arraignment of the three defendants the state nol-prossed the indictment against Elmer L. Edwards and proceeded against the other two defendants. Thereafter before trial the remaining defendants filed fourteen pleas in abatement to the indictment on the ground that the grand jury were illegally constituted because of the presence thereon of the jurors from Bristol county and also because certain other jurors were not drawn in strict accordance with the pertinent statute. They also filed a motion to quash the indictment. The state demurred to some of the pleas and replied to the others. The trial justice sustained the demurrer to certain pleas, overruled the other pleas in abatement, and denied the motion to quash.

The first plea in abatement, as amended by the thirteenth plea, alleges the presence on the panel of three inhabitants from Bristol county, and challenges the constitutionality of secs. 11, 14, 18, 29 and 35 of chap. 700 of public laws of 1939, under which provisions the three Bristol county residents were authorized to serve as grand jurors. The defendants contend that the presence on the panel of individuals residing in another county violates the rights secured to them by secs. 7 and 10 of article I of our state constitution; that the statute authorizing the same is therefore unconstitutional; and that consequently a grand jury so con-

stituted for Providence county is illegal and the indictment returned thereby is void.

The defendants argue that the only legal grand jury in this state is a common-law grand jury. They base such contention on *Opinion to the Governor,* 62 R. I. 200. In that opinion the court advised the governor in substance that secs. 7, 10 and 15 of article I of our state constitution constitute the essential guarantees of an accused, in certain cases, to a proper indictment by a grand jury, and to a trial by a petit jury which shall be inviolate; that sec. 7 secures to every person who might be accused of a serious crime the same protection as had been provided by the common law, through the same kind of a grand jury which was traditional at common law and functioning in substantially the same way; that in our constitution there is no provision giving to the general assembly power to change the character and functions of the grand jury as they had been established at common law; and that the legislature in this state is therefore without power to change the character and functions of the grand jury as so established.

The defendants next contend that at common law a grand jury consists of only the inhabitants of the county for which they are sworn to inquire and in which the crimes they are to investigate were committed. In support of their contention defendants cite 2 Wharton, Criminal Procedure (10th ed.) §1279, p. 1740, other text writers, and decisions from other jurisdictions. This same issue was raised but not passed upon in *State* v. *Muldoon,* 67 R. I. 80, and *State* v. *Pryharski,* 83 R. I. 274. It is well settled in this state that if one member of a grand jury is not qualified when drawn, the indictment is subject to a plea in abatement and will be quashed. *State* v. *Davis,* 12 R. I. 492; *State* v. *Muldoon, supra.*

The instant grand jury was called to attend the superior court sitting at Providence for the counties of Providence and Bristol in accordance with G. L. 1938, chap. 498, §2,

as amended by P. L. 1939, chap. 704, now G. L. 1956, §8-7-2. The applicable portion of §2 provides: "The superior court shall hold its sessions every year at the times and places following, to wit: (a) at Providence, within and for the counties of Providence and Bristol * * *." In *State* v. *Pryharski, supra,* at page 277, the court construed this language to imply that both counties are to be treated as a unit and that in criminal matters the statute authorizes the impaneling of one grand jury for both counties composed of jurors from both to inquire into crimes alleged to have been committed in either county. No constitutional question was raised in that case. In our opinion the court's construction in the case at bar was proper and we shall treat the instant issue accordingly.

It is undoubtedly true that in England the common-law grand jury consisted only of inhabitants of the county for which it was sworn to inquire. But it is also true that there was no part of England which was not within some county and that the grand jury was summoned and returned by the sheriff to each session of the criminal court sitting within his county. But there is no provision in our state constitution requiring the establishment, existence or continuance of counties. Counties in Rhode Island are creatures of the legislature.

The defendants concede that the legislature has the power to combine two or more counties or to abolish all of them. But they contend that if the legislature exercises this power by combining two or more counties without abolishing the geographical or territorial lines between such counties, it cannot constitutionally provide that residents of one of such counties can serve on a grand jury to inquire into crimes committed in the other county so combined. They base their argument on the ground that such a grand jury is not a common-law grand jury, since at common law residence in the county wherein the offense is committed is a prerequisite for qualification for such service. The defendants'

contention rests entirely upon the meaning of the word "county." The correctness of their argument in turn depends upon whether county means the geographical lines of a political subdivision or the territorial lines of the jurisdiction of a grand jury.

At common law a grand jury was an appendage of the court under the supervision of which it was impaneled, having no existence aside from the court which called it into existence and upon which it was attending. 24 Am. Jur., Grand Jury, §2, p. 832. In our opinion the term "county" is used to define the territorial limits of the jurisdiction of a grand jury, and since it is merely an appendage of the court for which it is summoned and authorized to inquire, its jurisdiction may be made coextensive with that of the court's jurisdiction and the territory over which such jurisdiction extends, and not necessarily confined to the geographical lines of any county. General laws 1938, chap. 506, §37, now G. L. 1956, §12-11-2, provides in part: "The grand jury shall attend the superior court at Providence for the counties of Providence and Bristol * * *." It is clear that the legislature by the enactment of §37 expressly provided that the jurisdiction of the grand jury would be coextensive with that of the court when sitting for those counties.

It thus appears that for jurisdictional purposes in certain criminal matters the legislature combined the two counties into a single unit even though it permitted the two counties to retain their separate names and their geographical lines for other purposes. Since the jurisdiction of the superior court includes geographically both counties, and since the jurisdiction of the grand jury is coextensive with that of the court under whose supervision it is impaneled, it is our opinion that with respect to grand jury proceedings the combined counties are a "county" within the meaning of the requirement at common law that all members of a grand jury must be residents of the county

for which they are sworn to inquire. For these reasons there is no merit in defendants' contention that the statute which authorized the Bristol residents to serve on the instant grand jury is unconstitutional. Therefore the trial justice did not err in sustaining the state's demurrer to defendants' first plea in abatement.

The second plea, as amended by the fourteenth plea, alleges that the indictment was illegally returned because the attorney general and the grand jury permitted a court stenographer to be present during the examination of witnesses. The stenographer was present by virtue of the provisions of G. L. 1938, chap. 503, §3, as amended by P. L. 1946, chap. 1668, now G. L. 1956, §8-5-6. That statute authorizes the use of a stenographer appointed by the court, under certain conditions therein described, to report stenographically the testimony given before a grand jury and to be present only during the taking thereof. In their plea defendants further allege that such statute violates secs. 7 and 10 of article I of our state constitution and article XIV of amendments to the constitution of the United States.

The answer to this question depends upon whether the statute in question violates the basic constitutional requirements of grand jury proceedings. The defendants concede that there is a conflict of opinion upon this issue and they have cited authorities and decisions from other jurisdictions to support their contention. But it appears that by the weight of authority the presence of an official stenographer in the grand jury room during the testimony of witnesses and the taking and transcribing of such testimony in full will not abate the indictment, in the absence of statutory requirement or prejudice to the accused. 24 Am. Jur., Grand Jury, §44, p. 864.

Although it is well established that no person other than members of the grand jury can be present when it is deliberating or voting on an indictment, it is equally well established that the attorney general may, and in fact it is his

duty to, attend on the grand jurors with matters on which they are to pass, aid in the examination of witnesses, and give such general instructions as they may require. But he cannot be present while the grand jury is deliberating on the evidence or is voting on a matter under investigation. 24 Am. Jur., Grand Jury, §43, p. 863. This being so, we see no reason why the presence of an officially-appointed court stenographer, serving within the conditions imposed by the statute in question, would deprive an accused of any rights guaranteed under either the state or federal constitution.

It is well settled that a statute is presumed to be constitutional until the party raising the question of its unconstitutionality proves beyond a reasonable doubt that it is unconstitutional. *State* v. *Domanski,* 57 R. I. 500, 505. The defendants have failed to convince us that the permissive provisions of the statute in question violate the basic constitutional requirements of grand jury proceedings. Since they have failed to sustain their burden we must resolve the doubt in favor of the legislative action. *State* v. *Smith,* 56 R. I. 168, 183. We are of the opinion that the presence of a court stenographer in the grand jury room to take stenographic notes of the testimony may be validly authorized by statute, and that such statute does not violate constitutional rights, state or federal. Therefore the trial justice did not err in sustaining the demurrer to the second plea in abatement.

The twelfth plea having been neither briefed nor argued is deemed to be waived. The remaining pleas relate to the manner in which the jury commissioner summoned and called certain jurors for service on the grand jury and excluded others. The defendants contend that the commissioner did not act in strict compliance with the authority conferred upon him by law. The trial justice sustained the state's demurrers to the pleas demurred to and overruled defendants' remaining pleas. He based such rulings on sev-

eral grounds, but principally on the ground that, if there were any defects in the manner in which the commissioner performed this function of his office, such defects were merely technical errors which did not involve intentional wrongdoing or deliberate and arbitrary noncompliance with the requirements of the pertinent statute which were directory and not mandatory in nature. *Andrews* v. *R. I. Hospital Trust Co.,* 44 R. I. 118.

After careful consideration it is our opinion that such rulings were not in error. Assuming without deciding that the commissioner did not act strictly in accordance with the authority conferred upon him by law, in our opinion there was such substantial compliance. The indictment should not be set aside for mere irregularities, since it does not appear that there has been such a departure from the requirements of the statute as to affect the substantial rights of the defendants or to deprive them of the benefit of a fair and impartial grand jury. *State* v. *Fidler,* 23 R. I. 41, 45. Their exception numbered 105 to the overruling of their pleas in abatement is overruled.

Under exception 104 defendants contend that the trial justice erred in denying their motion to quash the indictment. The motion is based on eight grounds. We have already considered grounds 4, 5 and 6, which attack the validity of the indictment, in our discussion of the pleas in abatement and have found them lacking in merit. Grounds 1, 2, 3 and 7 allege in substance that the indictment is vague, uncertain, indefinite and duplicitous; that it does not charge defendants specifically so that they may know beforehand what the particular offense is of which they are accused; and that it does not sufficiently inform defendants of the nature and cause of the accusation made against them.

The defendants' principal contention in support of such grounds is that the indictment charges them with two distinct offenses, namely, a conspiracy, which is an indictable

offense, and a violation of G. L. 1938, chap. 612, §35, which is only a misdemeanor and not indictable. They contend that the joinder of these two offenses in the indictment is duplicitous and vitiates the indictment. In our opinion there is no merit in such contention. The indictment clearly charges a conspiracy to engage in bookmaking activities in violation of §35, and in addition alleges the overt acts done in violation of said section and in furtherance of the conspiracy. It is well settled that in a conspiracy to do something unlawful the execution thereof need not be alleged. *State* v. *Bacon,* 27 R. I. 252. It therefore follows that the allegations in the instant indictment referring to such overt acts were mere surplusage and not duplicity so as to vitiate the indictment. 1 Wharton, Criminal Procedure (10th ed.) §302, p. 346.

There is no merit in defendants' further contention that the charge in the indictment is improper as to time. A conspiracy is a confederation to do something unlawful either as a means or an end. As was said in *State* v. *Bacon, supra,* at page 261: "The gist of a conspiracy is the unlawful confederacy to do an unlawful act, or a lawful act for an unlawful purpose, though nothing be done in prosecution of it; the offence being complete when the confederacy is made." Such a confederation comes into existence the instant the unlawful agreement is reached. The exact time when this occurs is a matter of proof. But once the confederation comes into being it continues in existence as such until it is dissolved. There is therefore no merit in defendants' contention that the indictment charges several such compacts or agreements. In our opinion the indictment properly informed defendants of the nature and cause of the accusation against them and meets the test set forth in *State* v. *Doyle,* 11 R. I. 574, 575.

Under ground 8 of their motion to quash, defendants contend that the action of the attorney general in nol-prossing the indictment as to Elmer L. Edwards was tantamount to

an amendment thereof and hence vitiated the indictment. In our opinion there is no merit in defendants' argument that the action of the attorney general altered the charge in the indictment. The offense charged is conspiracy. The nol-prossing of the indictment against Edwards did not change the offense charged. In other words the corpus delicti remained as it was before the nolle prosequi. The concerted minds of two or more persons is required to support the offense of conspiracy. The dropping of one of defendants in the instant case still left two defendants and hence satisfied one of the fundamental requirements necessary to constitute the offense charged. It is well established that the corpus delicti and a defendant's connection therewith are separate and distinct. See *State v. Boswell,* 73 R. I. 358, 363. As we have already stated, the offense charged remained the same after the nolle prosequi. The effect thereof was to end the prosecution against Elmer L. Edwards for the time being, but it did not affect the remaining two defendants with respect to the corpus delicti. See *State v. McElroy,* 71 R. I. 379. In our opinion, therefore, the trial justice did not err in denying the motion to quash, and exception 104 is overruled.

The defendants have briefed and argued 79 exceptions to rulings during the trial admitting or excluding evidence. They contend in substance that the cumulative effect of error in such rulings deprived defendants of a fair and impartial trial. We have examined all of these exceptions. After careful consideration we are of the opinion that none of such rulings constitutes prejudicial error. In our judgment these exceptions are without merit and they are overruled.

At the conclusion of the evidence defendants moved for a directed verdict on the ground that there was no evidence to warrant a finding by the jury that they had conspired to violate the provisions of §35. They concede that the testimony of Edwards might justify a finding that defend-

ant Hovanesian was engaged in unlawful bookmaking and that such testimony might form the basis of an inference against Hovanesian, but they contend in substance that there is no evidence involving defendant Micek, either direct or inferential. From our reading of the transcript there is no merit in such contention.

Under the instant indictment the state is prosecuting defendants Hovanesian and Micek for conspiracy to violate the gambling laws. It is true, as the trial justice instructed the jury, that the state's case is based entirely on circumstantial evidence with respect to both the existence of the conspiracy and defendants' connection therewith. The state presented the testimony of two witnesses, Elmer Edwards and Robert F. Page, to show conduct on the part of Hovanesian and Micek warranting an inference that said defendants had agreed to carry on certain activities in violation of law. It appears from the evidence that Hovanesian operated a cafe in the city of Pawtucket and that Micek operated a restaurant in another part of the city.

Elmer Edwards testified that he was employed by Hovanesian to tend bar and to take horse bets in his cafe; that he started to work in August 1953 at $50 per week; that he worked from noon to 6 p.m.; and that he was so employed until October 17, 1953. He described the physical appearance of the cafe, stating that there was a pay telephone at one end of the bar and an extension telephone under the bar; that there was a drawer under the bar which was kept locked; and that he and Hovanesian each had a key to the drawer. He also testified that Hovanesian gave him notebooks and slips which were to be kept in the drawer; that he was instructed by Hovanesian to take bets, record them on a piece of paper, put the money in the drawer under the bar, and call in the bets to a certain number given to him by Hovanesian; that he was to ask for "Lou"; and that he was not to mention Micek's name when he called the number.

The witness also testified that he took bets in person and over the telephone; that he called in between twenty and forty bets a day while he worked there; that the same voice always answered, but the person would never identify himself; and that the tallying of the sheets was mostly done over the telephone, although at times it was done with Micek at Hovanesian's cafe at the end of the day. He also testified that he would meet Micek three or four times a week in the cafe at night; that they would check over the figures for the day; that Micek would take the money which had been bet that day from the drawer under the bar; and that if they did not have enough money in the drawer to cover the next day's pay out, Micek would bring down more money. He also testified that Micek and Hovanesian met together in his presence when they "got hit" for a large amount of money and talked about it.

The witness also testified that when he was busy tending bar Hovanesian would take the bets and hand them to him; that he was told if they had a good week they would take care of him; and that he was not to take bets from any person who was not approved by Hovanesian. He stated that Hovanesian approved his taking bets from Robert Page and that is how he met him; that Page came to the cafe four or five times a week; and that on October 17, 1953 he bet about $2,500 which the witness telephoned in. Edwards also stated that he made pay outs in the cafe to winners and that Hovanesian had given him instructions as to the odds which he was to pay.

Page also testified for the state and his testimony in some respects was similar to that given by Edwards. He stated he met Edwards at Hovanesian's cafe in August 1953; that he started placing bets with him at that time; that he went there four or five times a week; that once or twice when Edwards was busy Hovanesian took his bet and turned it over to Edwards; and that on October 17, 1953 he placed several large bets at the cafe with Edwards.

The defendant Hovanesian testified in his own defense. He stated that he had operated the cafe in question for about nine years; that he had hired Edwards in August 1953 to work as a bartender with hours from noon to 6 p.m.; that he himself worked from 6 p.m. until closing time; that he did not book horses and did not allow anyone to bet in his establishment; and that if Edwards took any bets he took them on his own without Hovanesian's knowledge. He stated that he and Micek had been friendly for many years and that each had helped the other financially, but he denied engaging in any phase of booking horses. He stated that he knew Robert Page casually and had seen him possibly once or twice. In brief, Hovanesian's testimony was an absolute denial of complicity in any illegal activity.

It is clear to us from the foregoing that there is both positive and circumstantial evidence in the record indicating a violation of §35 by both defendants. From such evidence the jury could have reasonably inferred that defendants agreed and conspired to carry on the illegal activities testified to by Edwards. The question of the weight of the evidence or of the credibility of witnesses was not before the trial justice when he ruled on the motion for a directed verdict, nor is it before us in reviewing his ruling. In considering such motion the trial justice was compelled to view the evidence in the light most favorable to the state. In our opinion on the basis of the record before him he had no choice but to deny defendants' motion for a directed verdict. The exception to such ruling is therefore overruled.

We come now to defendants' exception to the denial of their motion for a new trial. In his decision denying such motion the trial justice carefully reviewed the record and the testimony of each witness in detail. He took into consideration the fact that Edwards testified for the state because the indictment against him was nol-prossed. He also considered the evidence that Edwards was fined in the

district court for taking bets and that Hovanesian refused to give him money for the fine. After exercising his independent judgment on the question of the weight of the evidence and the credibility of the witnesses, he concluded that the verdict of the jury was fully warranted and that the state had proved the defendants' guilt beyond a reasonable doubt. After careful consideration we cannot say that he was clearly wrong. The defendants' exception numbered 106 to the denial of such motion is therefore overruled.

The defendants have briefed and argued together a group of exceptions based on the ground that the trial justice erred in refusing to grant certain requested instructions to the jury. They have also briefed and argued three exceptions to portions of the charge. We have carefully read the instructions requested and the charge in its entirety. In our judgment the charge sufficiently covers the matters properly raised by the defendants in their requests and such exceptions are without merit.

The exceptions which have been neither briefed nor argued are deemed to be waived.

All of the defendants' exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*J. Joseph Nugent*, Attorney General, *Raymond J. Pettine*, Assistant Attorney General, for the State.

*Aram A. Arabian, William T. Kanelos*, for defendants.