STATE

v.

John E. QUATTROCCHI.

No. 95–343–C.A.

Supreme Court of Rhode Island.

July 31, 1996.

Lauren Sandler Zurier, Special Asst. Atty. General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

John A. MacFadyen, III, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the defendant, John E. Quattrocchi, from a judgment of conviction entered in the Superior Court pursuant to a jury verdict finding him guilty of two counts of first-degree sexual assault in violation of G.L.1956 § 11–37–2, as amended by P.L.1981, ch. 119, § 1, and § 11–37–3. Following the verdict of the jury, the trial justice sentenced the defendant to two concurrent sentences of sixty years, with forty years to serve and twenty years' probation to follow his release on each count. In support of his appeal the defendant raises five issues. We sustain the appeal in part and remand the case to the Superior Court for a new trial. The facts of

the case insofar as pertinent to this appeal are as follows.

The complaining witness, who shall be called Gina (a fictitious name), was nineteen years of age at the time of trial. She testified that in 1978, when she was between three and four years of age, defendant began dating her mother, whom we shall call Jane (also a fictitious name). Gina had never known her biological father, and consequently defendant came to fill the paternal role in Gina's life. This relationship continued between Gina and defendant for nearly ten years after he ceased dating her mother in 1981. The relationship was close and loving up until the end of Gina's junior year in high school. The defendant gave gifts to Gina, read to her, paid her private school tuition for two years of high school, attended school events with her, celebrated holidays with her, and encouraged her educational and career aspirations.

This idyllic relationship was shattered during the spring of 1992 when Gina was admitted to Butler Hospital twice in rapid succession because she was depressed and suicidal. For two years prior to her admission, she had been receiving psychological therapy for depression and severe mood changes. One incident involved an outburst of rage in which she threatened her mother, brandishing either a knife or a pair of scissors. During her out-patient treatment a variety of medications had been prescribed. The admitting diagnosis to Butler Hospital was bipolar disorder, a form of mental disorder sometimes described as manic depression.

During her admission at Butler Hospital, Gina experienced a series of "flashbacks" during which she recalled incidents of abuse by defendant during her childhood. These "flashbacks" were triggered by Gina's observing things that reminded her of an event that occurred during the abuse. Gina informed the staff at Butler Hospital about these flashbacks and as a result of this information her treating physician, Daniel Harrop, Ph.D. (Dr. Harrop), and other members of the staff reevaluated the diagnosis of bipolar disorder and substituted a diagnosis of posttraumatic stress disorder (PTSD).

At trial Dr. Harrop testified that the symptoms of bipolar disorder are similar to and overlap with symptoms associated with PTSD. The distinguishing feature is that bipolar disorder has a chemical basis and is congenital according to Dr. Harrop whereas PTSD is precipitated by traumatic stress or a traumatic event outside normal human experience. Such events would include automobile accidents, sexual abuse, combat experience, or some other situation in which the patient would feel seriously endangered.

It should be noted that while she was at Butler, Gina complained that she had been molested by another patient. After she was released from Butler for the second time Gina reported the previously repressed recollections of sexual abuse (which came to her in flashbacks) to the police department of the town of Lincoln, Rhode Island. This report was made in May 1992. Before reporting to the Lincoln police, Gina discussed these flashbacks and the remembered incidents of abuse with her mother. She and her mother consulted two attorneys concerning the possibility of a civil action against defendant. However, as of the time of trial she testified that she chose not to bring suit against defendant and, therefore, had not retained counsel. She further testified that by the time of trial she had ten or fifteen full memories of abuse by defendant in the form of flashbacks. Her flashback recollections include the two incidents upon which the indictment was based. One incident allegedly took place in Lincoln between May 1 and September 30, 1983. The other incident allegedly occurred on Narragansett Bay off Middletown between May 1, 1981, and September 30, 1982. Both incidents took place between ten and twelve years prior to the date of trial, which took place in June 1994. Gina testified concerning these incidents, and her testimony was corroborated by that of Dr. Harrop and also a psychiatric nurse, Karen Marie Kulik (Nurse Kulik), who had conducted therapeutic sessions with Gina while she was hospitalized at Butler during the months of March and April 1992. Nurse Kulik also testified concerning Gina's flashbacks and her being fondled by defendant.

Although defendant has raised five issues in support of his appeal, this court will consider only three of these issues and will provide further facts as may be necessary in order to discuss these issues.

I

Flashbacks or Repressed Recollection

As late as 1991 Gina's relationship with defendant was extremely close and loving. She had no recollection of any sexual abuse by defendant prior to her admission to Butler Hospital. The events that underlay the two counts of the indictment in this case had been repressed during the intervening years between their occurrence and the flashbacks Gina experienced during her Butler Hospital admission and the further flashbacks that occurred subsequent to her release from Butler. The defendant objected to the admission of testimony relating to these flashbacks and also to the expert medical testimony of Dr. Harrop and Nurse Kulik by a motion in limine. In support of the motion defendant submitted memoranda of law that raised questions of bolstering and also challenged the reliability of Gina's flashback memories. In one memorandum defendant compared psychodynamic therapy to hypnotically enhanced recollections and raised the issue of the validity and reliability of such therapeutic techniques. The defendant in one memorandum argued that such expert testimony should not be admitted.

The trial justice determined that both the flashback recollections of Gina and the expert testimony in corroboration thereof should be admitted before the jury. He did not hold a preliminary evidentiary hearing to determine the reliability and competency of such testimony, but he declared that the probative value of the evidence was a matter of weight to be considered by the jury.

Perhaps no area of the law has been more productive of controversy than that of the reliability and admissibility of testimony, expert and otherwise, relating to repressed recollection. This controversy has frequently arisen in the context of attempts to extend the statute of limitations in civil cases in circumstances when recollections have been repressed for many years and then released in the course of psychological treatment or psychiatric therapy. Such a case was *Tyson v. Tyson*, 107 Wash.2d 72, 727 P.2d 226 (1986). In that case a certified question was submitted to the court concerning whether the repression of recollection should toll the statute of limitations. This question was certified by the Federal District Court for the Western District of Washington in which a plaintiff had alleged sexual abuse against her father when she was between three and eleven years of age. *Id.* at 74, 727 P.2d at 227. She was twenty-six years of age at the time of filing the complaint. *Id.* The Supreme Court of Washington, in a sharply divided opinion, declined to extend the statute of limitations and to apply the discovery rule in relation to these repressed recollections. In so doing, the majority expressed serious doubts that the plaintiff's subjective claims could be supported adequately by treating psychological and psychiatric testimony. The majority held that such expert testimony "would not reduce, much less eliminate, the subjectivity of plaintiff's claim." 107 Wash.2d at 78, 727 P.2d at 229. The court went on to state:

"Psychology and psychiatry are imprecise disciplines. Unlike the biological sciences, their methods of investigation are primarily subjective and most of their findings are not based on physically observable evidence. The fact that plaintiff asserts she discovered the wrongful acts through psychological therapy does not validate their occurrence. Recent studies by certain psychoanalysts have questioned the assumption that the analyst has any special ability to help the subject ascertain the historical truth. *See generally* Wesson, *Historical Truth, Narrative Truth, and Expert Testimony*, 60 Wash.L.Rev. 331 (1985). These studies show that the psychoanalytic process can even lead to a distortion of the truth of events in the subject's past life. The analyst's reactions and interpretations may influence the subject's memories or statements about them. The analyst's interpretations of the subject's statements may also be altered by the analyst's own predisposition, expectations, and intention to use them to explain

the subject's problems. Wesson, 60 Wash. L.Rev. at 334–37, 349–50. Thus,

> the distance between historical truth and psychoanalytic 'truth' is quite a gulf. From what 'really happened' to what the subject or patient remembers is one transformation; from what he remembers to what he articulates is another; from what he says to what the analyst hears is another; and from what the analyst hears to what she concludes is still another.

Wesson, 60 Wash.L.Rev. at 338. While psychoanalysis is certainly of great assistance in treating an individual's emotional problems, the trier of fact in legal proceedings cannot assume that it will produce an accurate account of events in the individual's past.

> "The purpose of emotional therapy is not the determination of historical facts, but the contemporary treatment and cure of the patient. We cannot expect these professions to answer questions which they are not intended to address." 107 Wash.2d at 78–79, 727 P.2d at 229.

Justice Pearson, writing for the dissenting justices, vehemently disagreed with the majority and argued that psychological evidence was far more reliable than had been suggested in the *Wesson Law Review* article. He pointed out that the courts of Washington have relied on the expertise of mental-health professionals in a wide range of contexts, including those dealing with the battered-woman syndrome. 107 Wash.2d at 86–87, 727 P.2d at 233.

The controversy continues in other jurisdictions. For example in *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis.2d 302, 533 N.W.2d 780 (1995), the Supreme Court of Wisconsin declined to extend the statute of limitations in a case involving partially repressed recollection and, in so doing, expressed skepticism concerning the ability of triers of fact and the engine of cross-examination to produce truth when complaints are made many years after the fact and the symptoms are emotional and psychological—

> "But here the alleged damages are all 'emotional' and 'psychological,' with the plaintiff's experts claiming that damage ex-

ists and was caused by the defendant, and the defendant left in the position of attempting to prove either that the plaintiff is not 'emotionally damaged' or that he is not the cause of that damage. 'While some courts may have blind faith in all phases of psychiatry, this court does not.' * * * 'Nor are we convinced that even careful cross-examination in this esoteric and largely unproved field is likely to reveal the truth.'" 194 Wis.2d at 322, 533 N.W.2d at 788 (quoting *Steele v. State*, 97 Wis.2d 72, 97, 294 N.W.2d 2, 13 (1980)).

Again, in this case there were vigorous dissents to the majority's skepticism toward the quality of proof.

In *State v. Cressey*, 137 N.H. 402, 628 A.2d 696 (1993), the Supreme Court of New Hampshire reversed a conviction for aggravated felonious assault of children who had been placed in the care of the defendant and his wife. The charge was that the defendant had begun to abuse the complaining witness sexually when she was approximately eight years of age. The pattern of abuse included sexual touching, fellatio, and vaginal intercourse. The complaining witness did not mention the defendant's abusive acts to anyone until she was approximately fourteen years of age. The defendant was accused of molesting the complaining witness's sister. This abuse was not disclosed until shortly before trial. The principal issue raised on appeal was the admissibility of the testimony of an expert witness, Kathleen Bollerud, Ph. D., whose specialized training and experience was in the areas of psychology and child sexual abuse. Doctor Bollerud described flashbacks, nightmares, and dreams about sexuality. She evaluated both complaining witnesses, determining that they showed symptoms consistent with sexual abuse after analysis and information-gathering on her part. The Supreme Court of New Hampshire held that Dr. Bollerud's expert testimony was not sufficiently reliable to be admitted in a criminal trial as evidence that the two children had been sexually abused. The court distinguished between the therapeutic goals of the behavioral sciences and the search for truth in a criminal trial. In commenting upon the efficacy of cross-examina-

tion of such an expert witness, the court made the following comments:

"Finally, we are not convinced that a thorough cross-examination can effectively expose any unreliable elements or assumptions in Dr. Bollerud's testimony. The methodology used in the psychological evaluations makes her presentation of evidence effectively beyond reproach. Dr. Bollerud's conclusions do not rest on one particular indicator or symptom, but rather on her interpretation of all the factors and information before her. So even though the defendant may be able to discredit several of the indicators, symptoms, or test results, the expert's overall opinion is likely to emerge unscathed. An expert using this methodology may candidly acknowledge any inconsistencies or potential shortcomings in the individual pieces of evidence she presents, but can easily dismiss the critique by saying that her evaluation relies on no one symptom or indicator and that her conclusions still hold true in light of all the other available factors and her expertise in the field. In such a case, the expert's conclusions are as impenetrable as they are unverifiable." 137 N.H. at 410, 628 A.2d at 701.

Judicial skepticism is more than matched by skepticism among psychological and psychiatric academics. Elizabeth F. Loftus, Ph. D., in the May 1993 edition of *American Psychologist* has written an insightful article entitled "The Reality of Repressed Memories" in which she warns of the danger of therapeutically induced repressed memories and cautions against the use of suggestion by a therapist that may create narrative truth as opposed to actual truth. *Id.* at 526–28.

In Jacqueline Kanovitz, "Hypnotic Memories and Civil Sexual Abuse Trials," 45 Vand. L.Rev. 1185 (1992), the author compares hyp-

notically induced recollection to psychodynamic therapy. She states:

"Although the past can never be reconstructed in its original form, a well-trained therapist and an honest patient can usually create a fairly faithful reproduction of how things were. Nevertheless, a well-intended therapist and an honest patient can also follow the wrong direction and arrive at a portrait of the past that satisfies the requirements of 'narrative truth' [a picture of the past that fits the clinical picture], and that the patient will accept as true, but that in fact is false. 'Talking' psychotherapies are as capable of implanting false memories of childhood sexual abuse as hypnotic ones." *Id.* at 1246.

In respect to hypnotically induced or enhanced testimony, the Supreme Court of New Jersey in *State v. Hurd,* 86 N.J. 525, 543–46, 432 A.2d 86, 95–97 (1981), has set forth rigorous criteria for the admission of such hypnotic testimony. It is necessary prior to admission that the trial judge review the record of the evidence outside the presence of the jury in order to determine admissibility. *See also People v. Romero,* 745 P.2d 1003, 1014–1017 (Colo.1987). In referring to the foregoing authorities, both judicial and academic, we do not attempt at this time to resolve the controversy concerning the reliability and admissibility of repressed recollections as well as the expert testimony that may corroborate and support the basis for such repression and the reliability of the flashbacks or recovered recollections when they are offered at trial.[1]

■ We can only determine at this time that when such testimony is offered, particularly expert testimony relating to the basis for such repression of recollection and for the diagnosis of PTSD, which provides the ratio-

1. The controversial nature of traumatic memories of childhood abuse is further illustrated by two articles provided in the appendix to the state's brief, the "Final Report Of The Working Group on Investigation of Memories of Childhood Abuse" by Judith L. Alpert, Ph.D., co-chair, Laura S. Brown, Ph.D., Stephen J. Ceci, Ph.D., Christine A. Courtois, Ph.D., Elizabeth F. Loftus, Ph.D., and Peter A. Ornstein, Ph.D., co-chair, and an article "The Nature Of Traumatic Memories Of Childhood Abuse" by James A. Chu, M.D.,

Julia Matthews, Ph.D., M.D., Lisa M. Frey, Psy. D., and Barbara Ganzel. These articles by prominent investigators emphasize the lack of consensus in this very difficult field. Both articles stress that much additional research is needed, and that recovered memories for severe forms of abuse "should not be disqualified without consideration just as they should not be given unquestioned acceptance." Working Group Report, at 68.

nale for such repression and flashbacks, the trial justice should exercise a gatekeeping function and hold a preliminary evidentiary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on which expert testimony is appropriate. *See State v. Wheeler,* 496 A.2d 1382, 1386–88 (R.I.1985)(involving the admission of voice identification evidence produced by spectrographic analysis). Subsequent to that case, the Supreme Court of the United States in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), also determined in construing Rule 702 of the Federal Rules of Evidence (which is identical to Rule 702 of the Rhode Island Rules of Evidence) that guidelines should be provided for a trial judge to follow in determining the admissibility of scientific evidence: (1) whether the proffered knowledge can be or has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or the potential error rate, and (4) whether the theory or technique has gained general acceptance in the relevant scientific discipline. 509 U.S. at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83.[2]

We are persuaded that in Rhode Island a trial justice in a criminal as well as in a civil case must exercise this gatekeeping function and shall conduct a preliminary examination prior to allowing scientific evidence that supports repressed recollections or flashbacks to be submitted to the jury, if such evidence is challenged by an appropriate objection or motion to suppress.[3] The trial justice in this case, perhaps for lack of adequate guidance from our prior opinions, did not hold such a preliminary hearing. Our decision today, we

hope, will provide such guidance in the future. This holding is, of course, applicable to the case at bar. We agree with the dissent that our prior opinions and the language of Rule 104(c) of the Rhode Island Rules of Evidence do not give adequate guidance to a trial justice when confronted with the proffer of a novel and controversial body of scientific evidence. It is intended that this opinion should clarify the obligation in accordance with the standards set forth above.

■ The failure to hold such a preliminary hearing deprives a defendant who has moved to suppress or exclude scientific evidence that has not been validated from an opportunity actively to challenge its admissibility. Just as in the case of a confession challenged on the issue of voluntariness, the trial justice must afford as a condition precedent to admission an evidentiary hearing during which the essential findings of fact and conclusions of law will be made. *See Jackson v. Denno,* 378 U.S. 368, 380, 84 S.Ct. 1774, 1783, 12 L.Ed.2d 908, 918 (1964). The failure to hold such a hearing constitutes error. *Id.* at 391, 84 S.Ct. at 1788, 12 L.Ed.2d at 924. The state argues that this issue was waived. We must disagree with that position since the motion to exclude or suppress evidence in a criminal case is sufficient to trigger the right to a preliminary hearing to determine admissibility. *See* Super.R.Crim.P. 41 (in respect to illegally obtained evidence).

## II

### Evidence of Uncharged Sexual Encounters

In its rebuttal the state presented evidence concerning alleged sexual encounters by defendant with two young girls, whom we shall

---

2. Our citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) does not indicate that this court has abandoned the test enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), as analyzed in *State v. Wheeler,* 496 A.2d 1382, 1387–89 (R.I.1985), and applied in *State v. Dery,* 545 A.2d 1014 (R.I.1988). We shall leave to a later day the emphasis to be placed on general acceptance as set forth in both *Frye* and *Daubert* as opposed to the three other factors set forth in *Daubert.*

3. Such objection or motion to suppress should wherever possible be filed prior to trial unless opportunity therefore did not exist or the defendant was not aware of the grounds for the motion. *See* Super.R.Crim.P. 41.

In a civil case, the challenge to expert testimony or scientific evidence should be made sufficiently in advance in order to alert the trial justice to the need for holding a preliminary evidentiary hearing either prior to empaneling a jury or outside the presence of the jury.

call Lydia and Claudia (fictitious names). The first incident related to Lydia, who was defendant's godchild. This incident took place when she was seven years old during the summer of 1977 at defendant's home in Lincoln. While Lydia was showering after a swim, she testified, defendant entered the bathroom naked. He allowed her to depart only when she threatened to scream. Lydia did not tell her parents about these events until she was a sophomore in college. The second incident involved Claudia and occurred in the town of Warren on November 28, 1981. At this time Claudia accused defendant of touching her breast. She then ran out into the street where she encountered a police officer. The police officer arrested defendant. The case was presented to a grand jury, which returned a finding of "no true bill."

■ The defendant argues strenuously that this testimony concerning uncharged and unrelated incidents was extremely prejudicial to his defense and was a violation of Rule 404(b) of the Rhode Island Rules of Evidence. This rule reads as follows:

"(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

Even before adopting the foregoing rule of evidence, decisions by this court under the general evidentiary principles then obtaining precluded the introduction of evidence of other crimes save within strict constraints and for narrow exceptions. *State v. Colangelo,* 55 R.I. 170, 173–74, 179 A. 147, 149 (1935). In the seminal case of *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978), this court attempted to elucidate and clarify the doctrine of other-crimes evidence as it might relate to sexual offenders. In that case we stated that "all courts recognize that evidence of 'other crimes' will not be received if its sole purpose is to demonstrate the ac-

cused's propensity to commit the crime charged." *Id.* at 625, 382 A.2d at 532. We went on to discuss cases from other jurisdictions, notably *People v. Kelley,* 66 Cal.2d 232, 424 P.2d 947, 57 Cal.Rptr. 363 (1967), in which the Supreme Court of California had ruled that (1) evidence of other not-too-remote sex crimes with the prosecuting witness may be introduced to show the accused's lewd disposition or intent toward the prosecuting witness, (2) evidence that the accused committed nonremote similar sexual offenses with persons other than the victim may be admitted to prove the presence of the traditional exceptions to the general rule, such as intent or motive, with a caveat that evidence of other acts with other persons may be shown on the issue of intent only if it is absolutely necessary, such as instances in which the accused admits the act but claims that it was an accident or·a mistake, and (3) any doubt about the relevancy of such evidence should be resolved in favor of the accused, 66 Cal.2d at 239–43, 424 P.2d at 954–56, 57 Cal.Rptr. at 370–73.

This court, in adopting the principles enunciated in *Kelley,* formulated the following doctrine:

"We are extremely conscious that the indiscriminate use of 'other crimes' evidence poses a substantial risk to an accused's right to a fair trial. We adopt the holding in *Kelley* with the admonition that this type of evidence should be sparingly used by the prosecution and only when reasonably necessary. *Whitty v. State* [34 Wis.2d 278, 297, 149 N.W.2d 557, 565 (1967)]. The trial court should exclude such evidence if it believes it is purely cumulative and not essential to the prosecution's case. Evidence of other crimes is admissible only when it tends to show one of the exceptions to which we have previously alluded and only when that exception is relevant to proving the charge lodged against the defendant. *State v. Curry,* 43 Ohio St.2d 66, 330 N.E.2d 720 (1975)." *Jalette,* 119 R.I. at 627, 382 A.2d at 533.

Later, in *State v. Pignolet,* 465 A.2d 176 (R.I.1983), we revisited the *Jalette* doctrine and affirmed the principles enunciated in that case. In that case we approved the

admission of an act of sexual abuse committed against the sister of the complaining witness who was also the stepdaughter of the defendant. This court allowed the admission of this testimony since it tended to show a lewd disposition on the part of the defendant toward his two stepdaughters. *Id.* at 182. We emphasized that both children lived in the same house with the defendant and that all but one of the sexual acts took place during the same interval. *Id.* at 181–82. We pointed out that this type of evidence of similar conduct with young children living in the same household has been admitted in numerous cases in other jurisdictions, citing, *inter alia, State v. Parker,* 106 Ariz. 54, 470 P.2d 461 (1970); *Staggers v. State,* 120 Ga. App. 875, 172 S.E.2d 462 (1969); *Commonwealth v. King,* 387 Mass. 464, 441 N.E.2d 248 (1982), and *State v. Anderson,* 275 N.W.2d 554 (Minn.1978).

It should be noted that in *State v. Pignolet* a dissent written by the author of *State v. Jalette* suggested that the rationale that led to *Jalette* had "been laid to its eternal rest without benefit of so much as a eulogy." 465 A.2d at 184. There is no question that *Pignolet* expanded the *Jalette* doctrine insofar as it related to two stepdaughters in the same household but went beyond the narrow exceptions set forth in *Jalette.*

We are of the opinion that *Pignolet* represented the extreme beyond which we are unwilling to extend the other-crimes (or bad-acts) exception because of its overwhelming prejudice to defendant and its tendency to be viewed by the trier of fact as evidence that defendant is a bad man, and that he has a propensity toward sexual offenses and, therefore, probably committed the offense with which he is charged.

Rule 404(b) sets forth the exception to the exclusion of other-crimes evidence and codifies the principles to which our case law and such text writers as Professors Wigmore and McCormick alluded in their treatises. *See* Advisory Committee's Notes to Rule 404(b). These exceptions, as suggested in *Jalette,* included motive and intent. Neither element was at issue in the case at bar. There was no suggestion of an accidental touching. The complaining witness, if believed, described events that could scarcely have been termed accidental.

In its brief the state raises the issue of identity. We respectfully point out that there could be no question of identity in the case at bar. There was never any doubt that the complaining witness knew defendant and claimed defendant had committed these acts of first-degree sexual assault against her. The defendant stated that he did not commit the acts with which he was charged. No issue of identity was raised or could have been inferred from the evidence and testimony in this case. The suggestion of the dissent regarding admissibility of evidence of prior sexual encounters based in part upon a Note entitled *The Admissibility of Uncharged Misconduct Evidence in Sex Offense Cases: New Federal Rules of Evidence Codify the Lustful Disposition Exception,* 28 Suffolk U.L.Rev. 515 (1995), written by Lisa M. Segal, would, in our opinion, have the effect of superseding Rule 404(b) in respect to sexual assault charges. For the reasons stated in this opinion we are not willing to take such a drastic step.

The state also suggests that defendant placed his character in issue. If he had done so, then, of course, the state could have presented evidence of bad character in order to rebut the evidence of good character, R.I.R.Evid. 404(a)(1). However, an examination of the testimony in this case discloses that defendant did not present evidence of good character, particularly character inconsistent with the likelihood of his committing acts of sexual abuse. It is true that on cross-examination the state did elicit from certain of the defense witnesses that defendant had been gracious and generous, and one defense witness stated that she would not want to see defendant "unjustly convicted." Even had this evidence been elicited by counsel for defendant, it would scarcely amount to a contention that defendant was of such a character that he would be unlikely to commit a sexual offense. However, the testimony was drawn by the state from a defense witness on cross-examination. We have stated that the prosecution may not manufacture an issue on cross-examination in order to make rebuttal evidence admissible that otherwise could not be presented in support of the prosecution's case. *See State v. McDowell,* 620 A.2d 94, 96

(R.I.1993); *State v. O'Dell*, 576 A.2d 425, 429 (R.I.1990). Even though defendant testified in this case, after learning that the other-crimes evidence would be admitted, he did not purport to place his character in issue. Consequently we believe that the devastating evidence relating to the sexual incidents involving Claudia and Lydia was improperly admitted in violation of Rule 404(b) of the Rhode Island Rules of Evidence and in violation of the principles enunciated in both *State v. Jalette, supra,* and *State v. Pignolet, supra.* The evidence had no independent relevance that was reasonably necessary in order to prove the elements of the crimes charged. *See State v. Brigham*, 638 A.2d 1043, 1045 (R.I.1994); *State v. Lamoureux*, 623 A.2d 9, 13 (R.I.1993), and *State v. Cardoza*, 465 A.2d 200, 203 (R.I.1983). This evidence was of such extreme prejudice that no curative instruction would have been adequate to overcome or even to palliate its effect.

### III

### Venue of the Indictment

The defendant argues that the grand jury for the counties of Providence and Bristol did not have jurisdiction to return an indictment in respect to an incident that took place on Narragansett Bay off Middletown in the county of Newport in a boat owned by defendant.

This court had held in *State v. Barella*, 73 R.I. 367, 372, 56 A.2d 185, 187 (1947), that any offense committed on Narragansett Bay outside Providence county could be "found and tried" in any county at the discretion of the Attorney General pursuant to G.L.1956 § 12–3–4 as it then existed.

The state concedes that in 1981 § 12–3–4 was amended to read that an offense committed on Narragansett Bay could be "tried in any county in the discretion of the attorney general, unless otherwise ordered by the presiding justice." P.L.1981, ch. 104, § 1. The word "found" was omitted. The statute went on to state that "[f]or the purpose of prosecuting and punishing criminal offenses over which the superior court has jurisdiction, the State of Rhode Island is declared to be a single district." This court has held in *State v. Edwards*, 89 R.I. 378, 385–86, 153 A.2d 153, 158 (1959), that the grand jury's jurisdiction is coextensive with that of the court under whose supervision it is impaneled. We have stated that the 1981 amendments were enacted in order to enable the Superior Court to control its criminal-case load more effectively. *Advisory Opinion to the Governor*, 437 A.2d 542, 544 (R.I.1981). As a result of P.L.1981, ch. 104, § 1, we believe that the power of the Superior Court to try an offense committed on Narragansett Bay in any county would extend the jurisdiction to a grand jury in any county to indict for such offense if so requested by the Attorney General. This general power was not limited by the creation of a statewide grand jury by the 1981 amendment to § 12–3–4. The existence or nonexistence of a statewide grand jury does not affect in any way the jurisdiction and power of county grand juries that may operate simultaneously even if a statewide grand jury is in session. General Laws 1956 § 12–11.1–5.

Consequently we are of the opinion that the trial justice was correct in denying defendant's motion to dismiss count 2 of the indictment.

In light of our determination of issues I, II, and III, it is unnecessary for us to consider the other issues raised by the defendant.

For the reasons stated, the appeal of the defendant is sustained in part and denied in part. The judgment of conviction is vacated. The papers in the case may be remanded to the Superior Court for a new trial.

BOURCIER, J., did not participate.

FLANDERS, Justice, dissenting.

I respectfully dissent from parts I and II of the court's majority opinion for the following reasons:

### I

THE DEFENDANT WAIVED ANY RIGHT TO HAVE A PRELIMINARY HEARING OUT OF THE PRESENCE OF THE JURY ON THE FLASH-BACK AND REPRESSED–RECOLLECTION EVIDENCE BY FAILING TO REQUEST SUCH A HEARING BEFORE THE TRIAL JUSTICE.

Rule 104(a) of the Rhode Island Rules of Evidence provides that "[p]reliminary ques-

tions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined" by the trial court. However, only hearings on the "admissibility of confessions" must be "conducted out of the hearing of the jury." *See* R.I.R.Evid. 104(c); *see also State v. Killay,* 430 A.2d 418, 421 (R.I.1981) (noting that when the "voluntariness of an extrajudicial statement or confession is challenged, the trial justice must conduct an evidentiary hearing outside the presence of the jury in order to determine admissibility under constitutional standards"). Hearings on other preliminary issues "shall also be conducted out of the presence of the jury when the interests of justice require or, when an accused is a witness, if the witness so requests." R.I.R.Evid. 104(c).

Rule 104, therefore, does not mandate that the trial justice conduct evidentiary hearings on the admissibility of flashbacks or repressed-recollection evidence out of the hearing or the presence of the jury—until and unless the court *first* determines that the interests of justice so require. But that possibility did not materialize in this case because defendant never specifically asked the trial justice to conduct such a hearing or to make such a determination. He did file a motion in limine to suppress or to exclude this evidence. But nowhere in his memoranda or in his oral communications to the court did he request a pretrial evidentiary hearing or suggest that the trial justice make the kind of determinations discussed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). And when he was asked at the in limine motion hearing if he had "any problem with the victim testifying as to her flashbacks," defense counsel told the trial justice that he wished to "rest" on his legal memoranda. In these circumstances, there can be no reversible error on the basis of the trial

justice's failure to convene such an evidentiary hearing sua sponte.[4]

Moreover, the trial justice here had the opportunity to review the proposed flashback and repressed-recollection evidence in an adversarial proceeding outside the presence of the jury that ultimately convicted defendant. The defendant's conviction occurred at a *second* trial after his first trial before a jury aborted because of the declaration of a mistrial. At that first trial, both the complaining witness and the treating physician testified concerning the flashbacks and repressed-recollection evidence. Defense counsel had the chance to cross-examine these witnesses to challenge the reliability of this evidence. Thus, by the time of the second trial the trial justice already had the benefit of assessing the reliability of this testimony outside the presence of the second jury—thereby obviating any practical need to convene still another evidentiary hearing to have these same witnesses testify yet again on these same subjects.

Defense counsel also failed to object at either trial when the court proceeded to hear foundation testimony in the jury's presence on the admissibility of the victim's and the state's expert evidence pertaining to flashbacks and repressed recollections. The trial justice's decision to deny defendant's motion in limine to exclude this evidence "need not be taken as a final determination of the admissibility of the evidence referred to in the motion." *State v. Fernandes,* 526 A.2d 495, 500 (R.I.1987) ("the trial justice may, in appropriate circumstances, reconsider such a[n in limine] determination"). Thus, by remaining mute when the witnesses were called to testify at trial and by failing to request an evidentiary hearing outside the jury's presence, defendant has waived the right to raise this issue on appeal. *See, e.g., State v. Donato,* 592 A.2d 140, 141 (R.I.1991).

4. I cannot agree with the majority's suggestion that the mere filing of a motion to suppress or to exclude evidence of this type "is sufficient to trigger the right to a preliminary hearing to determine admissibility." Unlike motions to exclude evidence of confessions, where Rule 104(c) of the Rhode Island Rules of Evidence specifically mandates a hearing outside the jury's presence, there is no requirement that a trial justice convene such a hearing whenever motions are filed on other kinds of preliminary evidentiary matters. See, *e.g., State v. Sabetta,* 680 A.2d 927, 933–34 (R.I.1996) (affirming trial justice's exclusion of proposed expert testimony on eyewitness identification without requiring the trial justice to conduct a Rule 104 evidentiary hearing outside the presence of the jury before doing so).

Although I agree with the majority that in some situations the better practice may be to hold hearings outside the presence of the jury when the admissibility of novel "scientific" theories is at issue, I cannot fault the trial justice for failing to conduct a Rule 104(c) hearing in this case in the absence of a request by defendant that he do so and in the teeth of defense counsel's avowed intention to "rest" on legal memoranda that failed to make any such request—especially in a case like this one in which the trial justice already had the opportunity during the first trial to hear this evidence outside the presence of the second trial's jury and to assess its reliability. *Cf.* Fed.R.Evid. 104 advisory committee's note (acknowledging that "[a] *great deal* must be left to the *discretion* of the judge who will act as the interests of justice require" (emphases added)). In these circumstances, convening a nonjury evidentiary hearing would have been a colossal waste of everyone's time and money. Accordingly, I would sustain the trial justice's actions here.

II

EVIDENCE OF DEFENDANT'S UN-CHARGED SEXUAL MISCONDUCT WAS PROPERLY ADMITTED TO SHOW DEFENDANT'S LEWD DIS-POSITION.

I believe the trial justice properly admitted evidence of defendant's uncharged sexual misconduct under the lewd- or lustful-disposition exception to the general rule prohibiting the introduction of uncharged bad acts as evidence of a defendant's character or propensity to commit the charged crime. We have repeatedly relied upon this exception to permit prosecutors to introduce evidence of a defendant's other acts of sexual misconduct to prove lascivious intent, and the current trend in this and other jurisdictions has been toward broadening the range of acts involving defendant's prior sexual misconduct that will be deemed admissible in cases of this kind. *See State v. Brigham,* 638 A.2d 1043, 1045–46 (R.I.1994); *State v. Tobin,* 602 A.2d 528, 531–32 (R.I.1992); *State v. Messa,* 542 A.2d 1071, 1072–74 (R.I.1988); *State v. Cardoza,* 465 A.2d 200, 202–03 (R.I.1983); *State v. Pignolet,* 465 A.2d 176, 180–83 (R.I.1983); *State v. Jalette,* 119 R.I. 614, 624–28, 382 A.2d 526, 532–34 (1978); *see generally* Lisa M. Segal, Note, *The Admissibility of Uncharged Misconduct Evidence in Sex Offense Cases: New Federal Rules of Evidence Codify the Lustful Disposition Exception,* 29 Suffolk U.L.Rev. 515 (1995) (reviewing recent changes to the Federal Rules of Evidence that codify the lewd-disposition exception in sex-offense cases and the trend among state courts to expand the use of a defendant's prior sexual misconduct as evidence of his proclivity to commit the charged sexual offense(s)).

Indeed, we have previously refused to retreat from our own recognition of the so-called lewd-disposition exception to the general rule barring evidence of other "bad acts"—notwithstanding the failure of the Rhode Island Rules of Evidence to codify this common-law doctrine as one of the express exemptions set forth in Rule 404(b). *See Tobin,* 602 A.2d at 531–32.

We should continue to allow evidence of this kind to be introduced in child-molestation prosecutions because, in such matters, it is not unusual for there to be a dearth not only of eyewitnesses but also of independent physical evidence to establish the crime's commission. Indeed, the eyewitnesses are usually only the complaining witness and the alleged perpetrator. Thus, the alleged victim's credibility is usually of singular importance on the question of the defendant's ultimate guilt or innocence. In this type of sexual-misconduct case, admission of corroborative evidence in the form of defendant's other sex offenses of a similar type as those allegedly committed by defendant in the pending case serves to reduce the probability that the prosecuting witness is lying or hallucinating while increasing the probability that defendant committed the crime for which he has been charged.

Admission into evidence of defendant's other acts of sexual misconduct involving victims of the same class, type, or status as the complaining witness is also justified in child-molestation cases because

"these cases generally pit the child's credibility against an adult's credibility and of-

ten times an adult family member's credibility. Since sexual abuse committed against children is such an aberrant behavior, most people find it easier to dismiss the child's testimony as being coached or made up or conclude that any touching of a child's private parts by an adult must have been by accident. In addition, children often have greater difficulty than adults in establishing precise dates of incidents of sexual abuse, not only because small children don't possess the same grasp of time as adults, but [also] because they obviously may not report acts of sexual abuse promptly, either because they are abused by a primary care-taker and authority figure and are therefore unaware such conduct is wrong, or because of threats of physical harm by one in almost total control of their life." *State v. Edward Charles L.*, 183 W.Va. 641, 650–51, 398 S.E.2d 123, 132–33 (1990).

I also do not agree with the majority's suggestion that for such evidence of other sexual misconduct to be admissible, it must fit neatly within one of the expressly stated exceptions to Rule 404(b). Rule 404(b) provides in pertinent part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. *It may, however, be admissible for other purposes, such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." (Emphasis added.)

The enumerated exceptions set forth in that rule are merely illustrative and are not the exclusive purposes for which such evidence may be admissible. Moreover, this court has emphasized that although the lewd-disposition exception is at odds with the general prohibition against the use of prior-bad-acts evidence, "there is * * * a strong line of authority * * * recognizing a special exception for evidence of a defendant's disposition to commit sexual offenses." *Tobin*, 602 A.2d at 531.

In this case, I believe that the trial justice did not abuse his discretion in admitting such evidence to show that defendant had a lewd disposition toward young girls. In fact, this court, in sexual-assault and child-molestation cases, has previously upheld the admissibility of the defendant's other sexual misdeeds with the complainant victim to show an accused's lascivious intent toward that person. *Jalette*, 119 R.I. at 627, 382 A.2d at 533 (adopting the holding in *People v. Kelley*, 66 Cal.2d 232, 424 P.2d 947, 57 Cal.Rptr. 363 (1967)). We expanded that doctrine in *State v. Pignolet*, 465 A.2d 176 (R.I.1983), to permit a child victim, other than the complainant, to testify about a defendant's uncharged sexual misconduct toward other members of the victim's family.

In *Pignolet* evidence of the defendant's sexual misconduct toward a different stepdaughter was admissible to show that his actions toward the complainant stepdaughter were part of an ongoing pattern of aberrant sexual behavior toward young children in his charge. The rule created in *Pignolet*, however, was limited in that the only prior sexual misconduct that was admissible was that which was closely related to the crime(s) charged in time, place, age, family relationship of the victims, and the form of the sexual acts perpetrated. *Id.* at 181–82.

The majority contends that these limitations are necessary to avoid the overwhelming prejudice against a defendant that this type of evidence evokes in jurors. Under the majority's reasoning, however, if the third-party victim in *Pignolet* were a neighboring child rather than the complainant's sister, evidence of the defendant's sexual assault of that child would have been excluded on the basis that no family relationship existed between the neighbor victim and the complainant. Yet both instances clearly bear on the defendant's proclivity to commit sexual offenses against minor children within his ambit, and neither instance appears more emotionally prejudicial to the defendant than the other. Therefore, if this court is willing to admit evidence of a defendant's lewd disposition to commit sexual acts of the type charged, I fail to understand why such testimonial evidence must pertain to a victim who

is related to the prosecuting witness as opposed to one who is the defendant's godchild or who is otherwise under his thrall or within his or his family's circle of acquaintances.

In this case the state, in rebuttal, introduced two incidents of other sexual misconduct by defendant with two young girls. The first incident allegedly occurred in the summer of 1977 in defendant's pool cabin and involved defendant's then-seven-year-old godchild. While the seven-year-old was showering after a swim, defendant allegedly entered the shower naked and only allowed the child to leave when she threatened to scream. The second incident involved a twelve-year-old friend of defendant's godchild and occurred in the fall of 1981. The twelve-year-old went to a slumber party at defendant's godchild's home. She testified that while watching television late at night, defendant, who was kneeling in front of her, repeatedly rubbed her breast. Shocked and scared, the twelve-year-old ran out into the street and encountered a police officer. Subsequently defendant was arrested.

Both of these incidents of other sexual misconduct involved young girls and allegedly occurred during or near the period during which the charged sexual offenses were committed. Indeed, just a few months before defendant allegedly molested his godchild's friend, he coerced the then-seven-year-old complainant in this case to perform fellatio on him. The following summer, after a swim in defendant's pool, the complainant, then approximately eight years of age, engaged in sexual intercourse with defendant in the pool cabin of his Lincoln home.

Although I agree that such evidence should be admitted cautiously and not indiscriminately, I believe the trial justice did not abuse his discretion in allowing such evidence to be introduced in this case. Typically, the recondite nature of these types of sex-offense crimes and the resulting lack of disinterested witnesses in many of these cases are factors that favor allowing such evidence to be introduced, albeit only with a limiting instruction of the kind that the trial justice gave here. When one considers the reluctance of many child victims to report this type of crime, much less to testify at trial, and the conse-

quent difficulty of convicting child molesters and rapists, effective prosecution of such sex offenders would be unduly deterred if such evidence were not admissible. On the other hand, the exclusion of such evidence would result in conditions adverse to public safety, to the welfare of families and their children, and to the public interest. The need to admit such other sex-offense evidence is especially compelling in child-molestation cases because they often center on the testimony of a young child whose credibility can be easily impeached by the defense and contrasted favorably to the comparatively articulate adult defendant who can convincingly deny the truth of such reprehensible accusations.

However, because of the extremely prejudicial nature of such other sexual-misconduct evidence, it is important to maintain certain safeguards to protect a defendant from false accusations and injustice. First, such other sexual-misconduct evidence should be relevant to a material issue in the trial. Second, the evidence should be similar in kind to that of the charged offense. Third, the prosecution's proposed use of such evidence should be revealed in time for the defendant to have the opportunity to present a case in response and thereby reduce the possibility of unfair surprise. And finally, the trial justice should have the discretion to exclude otherwise relevant sexual-misconduct evidence if its probative value fails substantially to outweigh its prejudicial effect in the circumstances of the case.

Here, these conditions have all been satisfied. First, defendant's prior sexual misconduct was relevant to his motive to commit the crimes charged. " 'Motive' is said to be the moving course, the impulse, the desire that induces criminal action on [the] part of the accused." Black's Law Dictionary 1014 (6th ed. 1990). Thus, evidence of defendant's prior sexual misconduct bore on his lewd desire to be sexually intimate with young girls that befriended him. The evidence was also of critical importance to the complainant's credibility and was relevant to the issue of the perpetrator's identity. The incidents of defendant's prior sexual misconduct also corroborate the complainant's testimony. The defendant attempted to impeach her testimo-

ny on cross-examination by suggesting that she was emotionally disturbed, that she had a history of violent sexual contacts with other men, and that while on medication for manic depression, the complainant had imagined defendant violating her. Thus, evidence of defendant's prior sexual misconduct served to rebut these defense suggestions and to reduce the probability that the complainant was imagining defendant's sexual abuse of her or was confusing defendant's behavior toward her with some other unpleasant sexual experience.

Second, the evidence of other sexual misconduct was sufficiently similar to the charged offenses to warrant its admissibility. The uncharged incidents of sexual misconduct occurred during the same relative period as the charged offenses, with girls of similar age, who, to some extent, befriended defendant and whose testimony, if creditable, clearly indicates defendant's proclivity to commit sexual offenses with young, trusting girls.

Third, more than a year prior to trial and pursuant to discovery, defendant had received from the prosecution all the pertinent statements pertaining to his alleged sexual assault of his godchild's friend. He became aware of the immediate relevancy of this evidence during his cross-examination of the state's first witness and, in fact, sought and secured the court's permission for additional time to contact defense witnesses with knowledge of the incident. Further, there was a week's continuance prior to the introduction of evidence relating to the incident involving defendant's godchild, and defendant was contacted within three days of the state's discovery of this witness. In such circumstances, defendant's claim of unfair surprise is untenable.

Finally, the record reveals that on several occasions the trial justice carefully considered the evidence of defendant's prior sexual misconduct and concluded that its relevancy was not substantially outweighed by the potential for undue prejudice and that the jurors were entitled to consider all the evidence in determining defendant's guilt or innocence. The trial justice therefore properly performed his function and admitted highly probative evidence under a well-recognized exception to Rule 404(b) of the Rhode Island Rules of Evidence.

In my judgment the unique nature and distinctive character of sexual-assault and child-molestation prosecutions justify the continued vitality of the lewd-disposition exception. After all, if we are willing to admit evidence of the defendant's prior sexual assaults on the victim and on other members of the victim's family, it does not appear to me to be a great leap beyond these already existing exceptions to permit the introduction into evidence of the defendant's sexual assault of one or more of his godchildren or, for that matter, of any other young girl in his or his family's circle of acquaintances. All this evidence is highly relevant to showing the defendant's lewd disposition toward a certain class of persons of which the complaining child witness is a member.

For these reasons, I would sustain the decision of the trial justice in this matter and affirm the conviction on appeal.